Oral argument, 1-3-2, 15 minutes per slide. Ms. McGee, will you do that? Good morning, your honors. May it please the court, Carrie McGee, appearing on behalf of the plaintiff, Scott Trujillo. We're here today on an appeal from an order. First of all, I'd like to reserve three minutes for rebuttal. We're here on an appeal from an order granting summary judgment in this retaliation case brought under Title VII of the Federal Civil Rights Act and the Michigan Elliott Larson Civil Rights Act. The case arises out of Scott Trujillo's termination from employment as a corporate controller with Henniges in September of 2008. In this case, Mr. Trujillo contends that he was terminated because he complained to the Vice President of Human Resources that one of his bosses, the Vice President, Larry Rollins, was making derogatory comments about the races and that it was making him uncomfortable and that soon thereafter he was terminated. So this is not the second time this case has been before the court. Indeed, previously the trial court granted summary judgment finding that the plaintiff had not established the first prong of a retaliation claim, that is that the plaintiff engaged in protected activity. This court ruled in August of 2012 that the trial court had erred and in fact that Mr. Trujillo had engaged in protected activity and remanded the case to the trial court. When we got back to the trial court, the defendant again moved for summary judgment, this time contending that the plaintiff had not established the second and the fourth prong of the prima facie case and that is claiming that the defendant didn't know that Mr. Trujillo had engaged in protected activity and that even if it knew, the plaintiff could not establish the causal connection between the protected activity and the termination. Could you address the knowledge part of that? Sure. I think it's important to recognize the error that the court made in this particular case, although of course you're reviewing this de novo. But the court really viewed the facts in the light most favorable to the defendant instead of the plaintiff and also acted as a fact finder here. The court found that the Vice President of Human Resources, Ms. Gaspard, could not have understood Mr. Trujillo's complaint of concern regarding comments made by Mr. Rollins' protected activity and she did this by really accepting as true Ms. Gaspard's testimony but not acknowledging Mr. Trujillo's testimony. And it quite frankly defies logic that a Vice President of Human Resources who is told by an employee that one of the managers is making comments about the races that is making him uncomfortable and a Vice President of Human Resources who the court has already ruled was told something that amounted to protected activity did not perceive that as protected activity. And the evidence that accepting Mr. Trujillo's testimony is true establishes that there is at a minimum a question of fact as to whether the defendant knew. That's whether Ms. Gaspard knew or whether the people who fired him knew? Well, it's both. And in fact, in this particular case... The people who fired? I mean, assume for the moment that she didn't fire him? Okay, well I think that's a leap to say that she wasn't the one who fired him. What's the evidence that supports the inference that she had anything to do with the termination decision? Is it simply her being present in the meeting and the fact that she occupied the position of Director of Human Resources or is there something else? Well, I think for her, in terms of her knowledge and her participation, the fact that she's the Vice President of Human Resources and there was evidence that she was involved in decisions to terminate employees in that capacity, that was her job responsibility. That she was present at the time... You can't be involved without making the decision. You can be... I mean, you know, a Human Resources Director typically gives advice about termination, is involved. That doesn't necessarily mean the person who's the Director of Human Resources is the decision maker. That's true, and she may not have been the decision maker, but in this particular case... But if she isn't the decision maker and the decision maker doesn't know about anything Mr. Rollins said, any exchange between Mr. Trujillo and the Director of Human Resources, it's kind of difficult to get where you need to get. Well, I think that it isn't in this particular case based on the facts. And what you have is circumstantial evidence, first of all, that the Vice President of Human Resources... Let's assume that there's issues of fact as to whether she was provided with information that constituted protected activity. Now, as a Human Resource Director, if she was told by an employee that there was another manager who was making derogatory comments and she perceived that as protected activity, then in her capacity as Human Resource Manager, Vice President, it would be hard to believe that when a decision was made to terminate an employee, that she would not have communicated that to the decision makers so that they could take that into consideration, especially in light of the fact that the temporal proximity is so significant. She returns from Europe on September 8th. The decision to terminate Mr. Trujillo is on September 10th. She just heard Mr. Trujillo make a comment that constituted protected activity. That she wouldn't tell the Vice President of Finance that, in fact, he had made this comment when they were making a decision to terminate is hard to believe. But we don't even have to go there because there's further evidence that the decision makers knew and that it influenced the decision to terminate Mr. Trujillo. And I think if you look at the cases that... What's the further evidence? The further evidence is that Ms. Gaspard told this group of Vice Presidents, the day after Mr. Trujillo reported the protected activity, that they needed to watch what they said, that they needed to recognize when people who were not within their inner circle were around, and that they needed to avoid comments that may imply bias. These were comments made to these men. There's evidence that these men then complained to the people who did make the decision, Larry Williams and Mr. Dupree, the CEO. There's evidence that these men complained to these gentlemen about Mr. Trujillo's performance, complaints that had not been given to him in the past. And so there's evidence that these people poisoned the decision maker. You're telling me that the evidence is that Mr. Williams had never heard anything derogatory about Mr. Trujillo's performance until after he engaged in the protected activity, and suddenly there are all these complaints coming in about his performance that resulted in his immediate termination, just apparently very close in time to his return from this Europe trip, and that up until that point everything had been hunky-dory? No, I'm not saying that. I'm not saying that. I'm saying that certainly it was a new position. He had been in it for just four months, and they were going through the process of integrating two corporations. There were issues, okay? What is the evidence of what was said after the Europe trip or after? I mean, there's several leaps here. I mean, there's no indication that Ms. Gasperu let it be known that her warnings to the group included any mention of Mr. Trujillo or that they knew that Mr. Trujillo was the one who had, that somebody had complained and that it was Mr. Trujillo. I mean, wasn't she present at the dinner too? She was. I mean, so what's the leak here? Well, I think you have to take, and these cases are always difficult because the fact of the matter is that we're dealing with circumstantial evidence. Employers are sophisticated enough to know not to make direct comments, and so we're dealing with that all the time. But what you have here, you have to look at the total picture. Although the court said that the comments that Mr. Trujillo made to Mr. Rollins in the past about comments he made about Mexicans and about African Americans didn't amount to protected activity, those comments were made. We have to assume that those facts exist and that he did oppose Larry Rollins' comments in the past. Now, you've got this, the fact that he's had three different confrontations with Mr. Rollins about how he talks about minorities. And now you have Mr. Rollins making another comment at dinner where Ms. Gaspard is there, and then the very next day Ms. Gaspard's telling them, watch what you say, you don't want to make comments about bias. And I think the fact that Mr. Rollins knows about Mr. Trujillo's past and about how he had opposed it in the past leads to the inference that they knew that he was the one that was complaining. He was the only one who wasn't there at the time. He was the only one not part of the inner circle. And he had opposed comments of that nature in the past. Does it do harm to you in drawing the inferences that you'd like for the court to cite or permissible ones that Mr. Trujillo himself testified about the nonspecific nature of his comments to Ms. Gaspard and that he understood her to have reasonably interpreted them as referring only to what was said at dinner? Does that help the case? No, it does not, certainly. But I think what you have to take in, it's not the death knell. It does not constitute an admission. It was clever questioning of a plaintiff in front of Ms. Gaspard, who's sitting across the conference table, and asking, did you hear her testimony? And, you know, he's in kind of a difficult situation in terms of testifying whether she's lying, okay? But it doesn't matter. It's not an admission. He can't judge credibility on what he said. Oh, I agree with that. You don't have to convince me of others. I just say that, you know, even Mr. Trujillo doesn't make a real strong argument for the inferences that at the end of the day one must draw to permit the inference of a retaliatory motive for the termination. I think that's a problem at trial. I do. I think that's an issue that I'll have to deal with at trial, but I don't think that it justifies summary judgment. The court's already ruled that what he said to Ms. Gaspard, based on the testimony, constitutes protected activity. And if that constitutes protected activity, then certainly the vice president of human resources had knowledge that it was protected activity. Her actions demonstrate that she took it that way. She said that she had an obligation to act on it, and that she did admonish these men the next day. And then you have just, you know, two, three days later, he's being terminated and she's part of that process. And so I think the links exist to establish all the necessary prongs of the prima facie case. It would seem like a logical thing for her to do would be to take action by alerting them to the fact that they need to be careful without attributing it to a particular complainant. It seems like the last thing a good human resources person would do would be to say, so-and-so has complained about your comments, so you better be careful. A much wiser thing would seem to be, you better be careful about your comments. I don't disagree with that. So why is it so hard to, and then she said that's what she did, right? She said, I didn't mention him. That's true. So where's the evidence that she did mention him if the normal thing would be not to, and she says she didn't? If the normal thing would be to do it, then you could say, well, we can draw the inference that she would do the normal thing. Are you with me? Do you see what I'm asking? No, I do. And I think that I understand why, as a human resources vice president, she might not mention his name. But I think she didn't have to mention his name based on the history that Mr. Trujillo had with Mr. Rawlings. I think they would think that she wouldn't care herself as director of human resources. Why isn't it just as likely that the comments emanated from her own observation at dinner? It may be likely. Just as likely. It may be, Your Honor, but we're looking at issues of fact here. And Judge Rogers, you mentioned, wouldn't it be logical for the vice president of human resources not to mention Mr. Trujillo? Yes, I think that makes good sense. It also makes good sense, as a vice president of human resources, that when a decision is made to terminate somebody, right after the person is engaged in protected activity, that you communicate that to the decision-makers as well. It's also after there's evidence that he also engaged in poor performance. So, I mean, it's not in a vacuum. It isn't in a vacuum.  I agree. I know we shouldn't be waiting, and I don't mean to suggest that. Did you reserve some time for a vote? I did. Okay. Thank you, Judge. Thank you, Judge. Tracy. Good morning, Your Honors. May it please the Court, Catherine Tracy on behalf of Pennington's Automotive. I recognize that defense attorneys regularly stand before you and cite Sixth Circuit precedent to show that speculation and conjecture can't be used by an employment discrimination plaintiff to support their claim of discrimination. What's less common is what we have here, where the plaintiff himself acknowledged during the deposition that the link between his protected activity that takes him to the discharge decision was based on, quote, a lot of speculation, which he did in his deposition. Mr. Trujillo, the plaintiff here, was hired as the corporate controller and only worked there for five months. In that short period of time, as Judge Gibbons pointed out, he had a myriad of performance issues, primarily dealing with his financial reporting, which was at the center of his job responsibilities. Within the first 30 days of his employment, the president of the company had to call him in, along with his supervisor, to give him what plaintiff described as unfavorable feedback with respect to the timeliness and the accuracy of his financial reporting. Plaintiff said he would do better. He didn't. The problems continued. Mr. Trujillo also had admitted problems, which he admitted both in an e-mail to his supervisor and during his deposition with meeting deadlines, and admitted that he was behind on a lot of important projects for his supervisor, Mr. Williams. Now, instead of these admitted, acknowledged performance problems that started at the beginning of his employment and continued until the very end, he claims that the decision was based on this vague offhand conversation that he had with Jerry Gasparut, the vice president of human resources, on the way back from dinner. Now, I think the context of that dinner conversation is very important because that is her sphere of reference. What happened there is they were walking back from a dinner while they were on an assignment in Europe, and at that dinner there was a conversation that turned to the performance of the controller at the Guadalajara, Mexico plant, who happened to be of Mexican national origin. Now, no comments were made during that dinner about his national origin. It focused on his performance. One of the comments made, which was by Larry Rollins, who is the person Trujillo repeatedly complains about, was that this Mexican controller was effing worthless, except he used the actual profanity, which, as you might expect, a human resources person might raise her eyebrows to. It was in that context and having just sat through that dinner conversation that she understood plaintiff's comments to her. And his comments to her... Why did she say she had to do something about it? Well, I think as a... You don't have to do something about it. Well, I think that any human resources professional worth their salt, if they hear a dinner conversation where a subordinate is described as effing worthless and those kind of comments are going to be made, and somebody expresses discomfort with that, they're going to address it. I mean, it's just like if I were sitting at a table with some of my... It's the fact that someone complained about it that made her feel that it needed to be addressed. Other than that, that's the clear implication you get from the deposition, that she didn't feel it was a necessity, whatever was imposing the necessity, from the situation, but once there was a complaint, then there was a necessity. Well, that may be true, but I think that's out of respect, again, for a person who's uncomfortable. You know, a good human resources professional is concerned about the overall work environment. If someone comes to them and says, I'm uncomfortable by something you said, then you need to do something about it. But the problem, which I think has been raised already with the plaintiff's case, is that they can't prove knowledge in any way, shape, or form, and every attempt to do so is based merely on speculation. Trujillo claims he made this comment to Gaspard. Gaspard didn't understand it. The plaintiff acknowledges that Gaspard reasonably misunderstood what he was trying to tell her. But even if you believe that Gaspard did understand what he was doing, that he was engaged in protected activity, which there's no evidence of, she didn't participate in the decision. She was not the decision-maker. The decision-maker, according to the uncontradicted testimony, was Larry Williams. Larry Williams, who was his supervisor. Could the jury conclude that the decision-makers or the other people at that meeting might have been able to infer that Trujillo was uncomfortable with the denigration of the workability of the people without a racial aspect to it, and just didn't like the way his fellow workers were being referred to in such disparaging terms? Well, I have a few answers to that. I guess the first one is if that's how they interpreted the comment, if they just interpreted it as don't be disparaging to coworkers, then they wouldn't have believed it was protected activity. That wasn't my question. I'm sorry. I asked could the jury infer that, and you said if they did, I want to know if they could. I don't think that they could. I think that that would be mere speculation to draw that conclusion. These executives who were... It seemed like they could figure that out, though. I mean, I understand that you're relying on the fact that he, in the deposition, acknowledged that Gaspard may not have treated it as a race or ethnicity kind of comment, but rather a disparagement of workers kind of comment. But you're saying now that the people who heard Gaspard's little lecture wouldn't have any way of knowing or a jury couldn't conclude that that kind of discomfort came from Mr. Trujillo. I'm not sure that the statement of Mr. Trujillo in the deposition cuts either way on that. That just goes to whether it was racial or not. Well, it's not only Mr. Trujillo's deposition testimony that the jury would have to consider, though. It's also the executives themselves. They testified that that's not how they interpreted Jerry Gaspard's admonition to them. What they said is, to the extent they thought about it at all, they thought that it was coming from her. That's what Larry Rollins testified to, and that was uncontradicted. And that's consistent with what she was trying to do. When she approached them, as you pointed out, she made an effort to make it sound like it was her who had picked up on the insensitivity of the dinner conversation anyway. Moreover, even if the executives, you could say the executives, knew about the protected activity, which there's absolutely no evidence that they did, to get to where plaintiff needs to go, there has to be proof that that caused Larry Williams to discharge Mr. Trujillo. And, again, there's no evidence of that. Larry Williams is a decision-maker. There's no question about that whatsoever. The executives that were in Europe did. David Van Zust, actually, is the only executive who ended up calling back to complain about plaintiff's performance. He didn't do that, according to the deposition testimony, until after the decision had already been made, and Larry Williams had gone to Jerry Gaspard and had her start preparing the separation paperwork. David Van Zust recalled calling back to the office on, I believe, September 12th, and the decision was made on September 10th. So it was before the actual termination was carried out, but after the decision had been made. And even then, you would have to believe that Larry Williams just simply rubber-stamped this recommendation coming out of Europe, which the evidence is he did not. Larry Williams himself independently reviewed the financial package that had been prepared by plaintiff, and which was much maligned on this Europe project, and Mr. Williams independently found that it was lacking. He didn't do a very good job on it. So, you know, there are just so many hoops that plaintiff needs to jump through, and so much speculation that needs to take place here in order to find that Hennig has had knowledge. Now, plaintiff has made some arguments that general corporate knowledge of the protected activity should be sufficient to establish that element of the Prima Fasci case.  If you look at Fenton B. Heysan, that case makes it clear that the person who made the decision has to have knowledge of the protected activity in order to establish the Prima Fasci case, the knowledge element of the Prima Fasci case. Moving past that, Judge Vitani was also correct when she found the plaintiff failed to establish a causal connection between his protected activity and the discharge decision. It is undisputed, plaintiff acknowledged multiple times, that well before he engaged in protected activity within two weeks of the last day of his employment, he had had a number of performance issues, and a number of performance issues that had been discussed with him. You know, plaintiff claims that there was no written documentation of his performance problems, but there were written correspondence which reflect the dissatisfaction that was occurring. And plaintiff had been called into the president of the company's office within the first 30 days to receive this unfavorable feedback and to make it clear what the company's expectations were for him. So it's not surprising that he wouldn't have received a performance evaluation or some sort of written documentation before his discharge. I'm sorry, Your Honor, I thought you were going to say something. No. And temporal proximity is also not enough. We acknowledge that the discharge decision was made somewhere between three and eight days before his discharge. But that's not sufficient to carry the day. The cases cited by plaintiff where temporal proximity can stand alone are ones where the discharge decision was made immediately after the protected activity occurred. In this case, was it made before or after the protected activity? The decision was made. Because wasn't it within a day or two of his return from this trip? Yes, it was within a day or two of his. It might have been the day of his return from the trip, which was at some time between three and eight days. Is the record clear on that? You just can't quite remember. Pardon me? Is the record clear on that? You can't quite remember. Well, he was discharged on September 15th. The record isn't entirely clear. The decision was certainly made after he engaged in protected activity. Okay. I think that is. Well, that's what, when you said three to eight days. No, the three to eight days I'm referring to is the time between his protected activity and the decision. Oh, okay. I'm sorry. I misunderstood what you were saying there. Well, perhaps I wasn't clear enough, so I apologize for that. But the case law cited by a plaintiff, the time period is much shorter. So in the Mickey case, for instance, a plaintiff had filed an EEOC charge, and the owner of the company received it that morning. Later that same morning goes and fires the plaintiff without any warning or prior known performance issues. That's not the case that we have here. If there are any further questions, I'd be happy to answer them. Otherwise, I will sit down. Do you have anything, Judge Guy? Nothing further at this time. Thank you. Ms. McGee, how much rebuttal time did you have? Three minutes. Just briefly, in terms of knowledge, in terms of Ms. Gaspert's knowledge, her testimony is just unequivocal that she knew. She testified after the dinner. We were walking back. Everyone was going back to the rooms. And Scott made a comment to me that Larry made some uncomfortable comments about Mexicans, and it was bothering him. She goes on to say, I know how to handle a harassment case. So she identifies this as a harassment case. She goes on to say, I knew I couldn't take it lightly, and I had an obligation. So the fact is that she knew. Now, she knew. Now we have the termination decision. We've talked a lot about what a good Vice President of Human Resources does. And the fact of the matter is that Ms. Gaspert returned from Europe on September 8th. The decision to terminate Mr. Trujillo was on September 10th. That's what the record says. The temporal proximity is acutely close. And she would have told Mr. Williams that this individual that they're about to fire engaged in protected activity. That's logical, as an HR VP and a jury could reasonably conclude that. It's not as if she didn't have anything to do with the termination. She was actually present at the time that Mr. Trujillo was terminated. And in addition to that, in terms of our requirement in order to get past a motion for summary judgment, temporal proximity is sufficient in itself to establish the causal connection prong. The trial court was incorrect in making that statement that it wasn't sufficient. Temporal proximity alone is enough. And these cases in the Sixth Circuit have made this determination, and we've cited them in our brief. But beyond that – There were all cases where there was knowledge, though. Pardon me? All those cases are where there was knowledge, though. Sure. And there's knowledge here. I mean, at a minimum, there's a genuine issue of material fact as to whether there's knowledge. But we also have evidence here that individuals who weighed in on Mr. Trujillo's termination knew that he had engaged in protected activity. And so the cat's paw theory really applies in this case because there's evidence that these individuals were complaining to the decision-makers as well. And also we have evidence that while they may claim that he had performance issues, there is evidence that there was no formal performance criticism given to him, no discipline, even though they had done that in the past. And Ms. Gaspert, in fact, had been involved in a case where Mr. Trujillo wanted to discipline an employee for performance issues, and he was told by her, you've got to document, you've got to give them an opportunity to improve. Nothing like this was done with Mr. Trujillo. In fact, the last performance review he got from Mr. Williams found him to have achieved three of the four objectives. And in addition, Mr. Williams had determined that he would be his deputy when he was gone. So there's evidence that there were no performance issues that would have justified his termination. Were there performance issues? Yeah, there's evidence of that, but nothing that would justify his termination until he complained. And then after he complained, he was terminated, came as a very big surprise to him, and at the time of the termination he wasn't told it was performance. Initially he was told just not a good fit, and then they started changing the decision or changing the explanation, which again is evidence that creates a genuine issue of material fact in this case. If there's nothing further, I believe your time is up. Thank you. We appreciate the argument both of you have given, and we'll consider the case carefully. The court may call the next case.